```
                   UNITED STATES DISTRICT COURT

              EASTERN DISTRICT OF NEW YORK (BROOKLYN)
         ----------------------------:
         BRIANNA CAMPBELL, et al.,    :Case No.22-cv-2813
                        Plaintiff,    :
                 v.                   :Brooklyn, New York
                                      :June 21, 2024
                                      :
         BUKHARI GROUP, LLC,          :
                        Defendant.    :
         ----------------------------:
              TRANSCRIPT AND STATUS CONFERENCE HEARING

                 BEFORE THE HONORABLE PEGGY KUO

                 UNITED STATES MAGISTRATE JUDGE


         APPEARANCES:

         For Plaintiff:        KESSLER MATURA P.C.
                               BY:  Garrett D. Kaske, Esq.
                               534 Broadhollow Road
                               Melville, New York 11747


         For Plaintiff:        THE LAW OFFICE OF DELMAS A. COSTIN
                               BY:  Delmas A. Costin, Esq.
                               930 Grand Concourse - Suite 1B
                               Bronx, New York 10451


         For Defendant:        MARKS, O'NEILL, O'BRIEN, DOHERTY
         Bukhari Group         & KELLY, P.C.
                               BY:  Kaitlyn P. Long, Esq.
                               530 Saw Mill River Road
                               Elmsford, New York 10523




         Proceedings recorded by electronic sound recording;
         Transcript produced by transcription service




                AMM TRANSCRIPTION SERVICE - 631.334.1445
```

1          THE DEPUTY CLERK:  This is civil cause for

2    a preliminary approval hearing, Docket 22-cv-2813;

3    Campbell, et al. v. Bukhari Group, LLC, et al.,

4    Magistrate Judge Peggy Kuo presiding.

5          Will the parties please state their

6    appearances, beginning with plaintiff.

7          MR. KASKE:  Good morning.  This is Garrett

8    Kaske from the law firm Kessler Matura for

9    plaintiffs.

10          MR. COSTIN:  And Delmas Costin from the Law

11    Office of Delmas A. Costin, Jr., for plaintiffs as

12    well.  Good morning, Your Honor.

13          THE COURT:  Good morning.

14          MS. LONG:  Good morning, Your Honor.  This

15    is Kaitlyn Long with Marks O'Neill for the

16    defendants.

17          THE COURT:  All right.  Good morning,

18    everyone.

19          There is a motion for preliminary approval

20    of the settlement agreement that will resolve the

21    state and federal claims in this case.  I've had a

22    chance to look at it, but I had some questions, and

23    so I wanted to have counsel here to explain things

24    to me.

25          So I guess my first question is that the

AMM TRANSCRIPTION SERVICE - 631.334.1445

1   notice talks about an approximate amount of money
2   that each claimant will get.  So can you just talk
3   through how you reached that number and, you know,
4   also your expectation of how many people will make
5   the claims.  Because there's also a provision for
6   leftover claims -- or leftover money, so I just
7   wanted to make sure I understand how the money is
8   being divided up.
9          MR. KASKE:  Yes, Your Honor.  This is
10   Garrett Kaske again for plaintiffs.
11          So to start, the approximate amount that's
12   been listed on the notice will be what we anticipate
13   to be each person's, like, actual settlement share
14   once they -- you know, pretax settlement share once
15   they get their checks at the end of this.
16          The money is being divided proportionally
17   pursuant to, basically, the value of what we
18   estimate everybody's claims.  And that -- you know,
19   the mechanism we're using for determining what
20   plaintiffs' claims could be proportional to other
21   workers is how much earnings that they -- how much
22   money they earned.
23          In this case, the workers were primarily
24   earning around the same amount per hour.  As a
25   result, if someone earned more during the class

AMM TRANSCRIPTION SERVICE - 631.334.1445

1    period, they're likely to have incurred more

2    damages.  Like, if they were working 50 hours a week

3    versus part-time, then it's more likely that that

4    person will have earned more money, and they would,

5    therefore, have arguably had more potential

6    violations of overtime, minimum wage and spread of

7    hours and the like.  So that's how the money is

8    being divided.

9          The only money that's going to be donated

10    cy pres will be anything that's not cashed.  So at

11    the end of the check-cashing period, if folks just

12    sit on their checks for whatever reason -- they'll

13    have 120 days to cash the checks.  But if for some

14    reason they sit on their checks, then that leftover

15    money will be donated cy pres.

16          In our experience, I don't expect that to

17    be much.  People usually cash their checks if

18    they've gone through -- you know, gone through the

19    effort of submitting a claim form, they usually cash

20    their checks.

21          In terms of expected claim rates, you know,

22    as noted in the brief, you know, defendants will be

23    providing the claims administrator with, you know,

24    last known contact information and Social Security

25    numbers for folks that can't be located.  That way,

1    the claims administrator will be able to do a skip

2    trace.  So we're hopeful as a result that there

3    won't be many undelivered notice in claim forms.  I

4    expect the undeliverable rate to be rather low.

5            In terms of expected claims rate, and

6    given, I think, the nature of this industry and what

7    we've seen in other cases of this type, you know,

8    plus or minus a third is what could be expected.

9    However, you know, we could see the claims get up to

10   about 60 percent or so, probably.  But that's just

11   based, you know, on our experience of reviewing case

12   law from other fast food or low wage industries in

13   this, kind of, Bronx, Queens, Brooklyn area.  But

14   additionally, just from our own experience of

15   working cases in these industries.

16           You know, and sometimes what happens is the

17   claim rate is relatively low in that like only, I'd

18   say, 40 percent of the people claim, but those 40

19   percent of the people were all the people with

20   higher damages, and, therefore, higher claims.  So

21   the actual money claimed might be significantly

22   higher.

23           THE COURT:  Right.

24           MR. KASKE:  We've seen that in a number of

25   matters as well.

1          THE COURT:  Right.  Okay.

2          So can we -- just so I understand how --

3     well, actually, have you identified the workers so

4     you have a good idea of who the workers are?

5          MR. KASKE:  Yeah.  So, you know, as part of

6     the negotiation process in the case, defendants, you

7     know, produced their -- you know, a contact list of

8     the class members and their approximate dates of

9     employment.  And there's about 470 of them.  So, you

10    know, they're known.  They're known to the parties

11    already.

12         THE COURT:  All right.  And so I'm just

13    going to do some rough numbers so I understand how

14    you're doing the calculations.

15         So the fully funded settlement number is

16    400,000, and you've asked for 35,000 to be divided

17    among some main plaintiffs.  And then maybe I should

18    pause here.

19         There were two additional people for whom

20    you're seeking service payments, Kayla Brathwaite

21    and Lakira Lovell (phonetic), but I don't know why

22    they would get service payments when they're not

23    named plaintiffs.

24         MR. KASKE:  Yes.  So, although they're not

25    named plaintiffs, they have been active in the

AMM TRANSCRIPTION SERVICE - 631.334.1445

1    litigation.  That has been helpful in terms of

2    bringing about this result.  You know, they have

3    worked with us to try and find witnesses.  They've,

4    you know, provided us with, you know, documents

5    which were part of the, you know, disclosures

6    provided in this case and discovery provided in this

7    case, which ultimately helped support the class

8    claims and, you know, can negotiate the result on

9    behalf of the unknown class members.

10           THE COURT:  Okay.  And did they opt in

11    already?

12           MR. KASKE:  So Kayla Brathwaite opted in.

13    Lakira Lovell is not within the three-year FLSA

14    period.  She exclusively worked in the New York

15    Labor Law period only, so we didn't opt her in just

16    because it would be misleading to opt her into

17    something that's already (indiscernible).

18           THE COURT:  Right.  Okay.

19           So when you file for final approval, you'll

20    give information as to why they, in addition to the

21    named plaintiffs, will be entitled to any service

22    award.

23           MR. KASKE:  We'll provide some more

24    particularized details on that for sure, Your Honor.

25           THE COURT:  Okay.  That sounds good because

1    their names just appeared and I didn't know who they

2    were.

3            All right.  So if you have the $400,000,

4    you take out -- let's just assume the 35,000 for the

5    plaintiff service awards -- you get $365,000.  Of

6    that, the lawyers are looking for 133,333.  That

7    gets us to 231,666 or so.  You estimate about 5,000

8    in costs.  So we're now down to 226,666.

9            Is there an estimate for what the

10   administrator will be seeking?

11           MR. KASKE:  Yes.  The administrator is --

12   sorry.  My computer's frozen.  I apologize.

13           So Expand Legal is seeking -- I believe

14   it's 8,750.

15           THE COURT:  Okay.  And so, again, I'm just

16   going to do some rough numbers.  That leaves

17   218,000.  Okay.

18           So you said of that number, you're going to

19   take the total number of class members -- you said

20   about 410 -- and you're going to be looking at each

21   person's hours worked that are covered.  And then

22   based on that, how much are you estimating each

23   person will be getting per hour for which they

24   should be compensated extra, or should be

25   compensated, if you know.

1          MR. KASKE:  So I just want to clarify three
2   things.  First is the administrator was, sorry,
3   12,500.
4          THE COURT:  12,500.  I see.  I see.  Yes,
5   it's on page 5.  Okay.
6          MR. KASKE:  And I don't know what the
7   per-hour breakdown is because the settlement is not
8   being -- I mean, the shares aren't broken up per
9   hour, rather it would be broken up per dollar
10  earned, effectively.
11          THE COURT:  I see.
12          MR. KASKE:  That's what's being used as,
13  kind of, the marker for what the workers --
14          THE COURT:  Okay.
15          MR. KASKE:  -- would be --
16          THE COURT:  Okay.  And so this case is
17  unusual the way you've --
18          MR. KASKE:  And the --
19          THE COURT:  Go ahead.
20          MR. KASKE:  So I just apologize.  I just
21  want to make one other correction.  There's 470
22  potential class members.
23          THE COURT:  470.  Okay.
24          MR. KASKE:  Yes.
25          THE COURT:  All right.  So if I just did a

AMM TRANSCRIPTION SERVICE - 631.334.1445

1    flat numerical division, which I know is not how

2    it's going to be because everybody will get

3    different numbers if -- 214,000 divided by 470 is

4    about $455.

5            MR. KASKE:  Yes.  Correct.

6            THE COURT:  Okay.  All right.  So then what

7    I -- this case is unusual because, normally, what I

8    see is that people make the claim.  And then based

9    on the number of people who make a claim, the money

10   will be divided up.

11        Here you have put in the claim notice the

12   calculation for what you think each person is going

13   to get.

14           MR. KASKE:  Yes.  Correct.

15           THE COURT:  And that, sort of, assumes that

16   there will be -- well, I shouldn't say it assumes,

17   but it's based on 100 percent participation.

18           MR. KASKE:  Correct.

19           THE COURT:  And so if there's a 40 percent

20   participation rate -- sorry, 60 percent

21   participation rate, approximately 40 percent of that

22   money will go to the cy pres organization, right?

23           MR. KASKE:  No.  Only uncashed --

24           THE COURT:  Claims.

25           MR. KASKE:  -- checks will go.  Yeah.

1      THE COURT:  But if people don't -- so then

2  that leaves me with a second question, which is,

3  since you're telling people upfront what amount you

4  think they're going to get -- and that assumes 100

5  percent participation, that's how you're doing the

6  math -- then if only a certain number of people

7  participate, what happens to the remaining money?

8      MR. KASKE:  So the remaining money would be

9  returned to defendant.  So unclaimed money would

10  revert to defendants.  Uncashed checks would be

11  donated cy pres.

12      THE COURT:  Why doesn't all of it go to

13  cy pres?  Why is the defendant getting any of the

14  money back?

15      MR. KASKE:  Well, we negotiated for a

16  claims-made reversionary settlement for the

17  unclaimed portion; however, like I said, the

18  uncashed is what will go to cy pres.

19      And just to address the first question

20  about the fluctuating amounts, you know, we

21  personally find that doing it this way, where, you

22  know, submitting a claim form isn't -- there's no

23  guessing in terms of what you're going to get --

24  this is what the folks are going to get -- is fair

25  and informs the workers on the front end.  There's

1    no way to disincentivize people from participating

2    by way of saying, well, if I claim but, you know, my

3    coworker doesn't claim, I'll get more money because

4    part of their money will go back into the pool.

5           We find that cutting the money -- divvying

6    up the net fund this way, in a way that their money

7    is locked in at this stage of the process, ensures

8    that people are more -- you know, can get the word

9    out and -- for folks that maybe thought the notice

10   was junk or otherwise had -- you know, might not

11   have gotten it, and it provides them some certainty

12   for them to check, you know, when the check comes

13   and they see their, you know, gross amount on the

14   check, and they see the gross amount on the notice,

15   if they've attained it.  You know, there's a level

16   of comfort there.

17          THE COURT:  Okay.  And I appreciate that

18   it's useful to know how much money you're going to

19   get because somebody who sees they're only going to

20   get $5, for example, might say it's not worth it,

21   but if they see that it's several hundred dollars,

22   then definitely they would be incentivized.  So I

23   understand that.

24          I'm still not sure why -- I generally find

25   that reversion agreements are disfavored unless

AMM TRANSCRIPTION SERVICE - 631.334.1445

1    there's a good reason for it.  And here you already

2    set up a cy pres, so I'm just not sure why there are

3    two buckets; that one is reversion to the

4    defendants, and the rest is going to a charitable

5    organization.

6              MR. KASKE:  Yeah.  Good question,

7    Your Honor.  I just --

8              THE COURT:  Oh, I'm sorry.  I heard the

9    defendant try to say something.

10             MR. KASKE:  Oh, sorry.

11             THE COURT:  No?

12             Okay.  I heard two voices.

13             MS. LONG:  No.  It's okay, Your Honor.

14             THE COURT:  Okay.

15             MS. LONG:  Sorry.  Gary can go.  He was

16   speaking.

17             THE COURT:  All right.

18             Okay.  I'm sorry.  I heard two voices, and

19   I wasn't sure who that was, so ...

20             MR. KASKE:  So I'll just speak briefly,

21   Your Honor.

22             I think it's just a matter of the

23   defendants' ability to pay and plaintiffs' counsel

24   trying to maximize the potential recovery for the

25   class.  You know, having done, you know, some

1    inquiries into their -- you know, having dug into
2    their other litigation history, you know, the
3    finances that we can find through our public record
4    searches, and, you know, the, you know, financial
5    information that was provided to us as part of the
6    discovery -- as part of the negotiation and
7    settlement process from defendants, the concern was
8    that a purely non-reversionary settlement in this
9    case would have ultimately resulted in a smaller
10   value.  And although people claiming might have
11   received -- you know, people claiming might have
12   received a bit more under the mechanism that the
13   Court was describing, you know, the potential for
14   people to receive, right, and the amount quoted on
15   their notice would have been lower.  So --
16              THE COURT:  Well, I guess I don't
17   understand that because I'm assuming -- maybe this
18   is the incorrect assumption.  I'm assuming that the
19   dollar amounts for all the notices that you're
20   sending out to the 470 potential class members add
21   up to $214,000.
22              MR. KASKE:  Correct.
23              THE COURT:  Okay.  And so then why would
24   they each get less if the amount that's not claimed
25   goes to the cy pres instead of back to the

              AMM TRANSCRIPTION SERVICE - 631.334.1445

1    defendants?

2            MR. KASKE:  Oh.  Well, if we modify the

3    current agreement, yes, of course, nothing would

4    change; however, I mean, I don't think -- from our

5    negotiations, when we had them at the time,

6    defendants would not have paid 400 -- would not have

7    created a pool of $214,000 to be divvied up for

8    those class members, knowing full well that all --

9    you know, as you know, all of them may claim, or a

10   high percentage of them may claim, you know, they

11   wouldn't have gambled that much money being put up,

12   for lack of better word to describe it.  They

13   wouldn't offer that much money to be put up to be

14   claimed if it had been a purely non-reversionary

15   settlement, which the parties did explore earlier in

16   the negotiation process.

17           THE COURT:  So you're saying --

18           MS. LONG:  And, Your Honor --

19           THE COURT:  Hold on.  Don't speak over each

20   other.

21           So, Ms. Long, I'll hear from you.

22           MS. LONG:  Sure.

23           Your Honor, part of the problem -- and

24   maybe Garrett just doesn't want to over share on

25   behalf of my clients.  But my clients are paying out

1    of pocket, and so I shared tax-return information
2    and everything based on all the entities during the
3    negotiations, which is part of the reason that my
4    client only can put up so much money.  So we were
5    pretty forthcoming with all of that, which put us at
6    some limitations and is part of the reason we
7    negotiated the way that we did.
8            THE COURT:  Okay.  So what I'm hearing --
9    and you don't have to go into the negotiation, but
10    I'm just trying to understand how it works, right.
11            So what I'm hearing is the defendant is
12    going to fully fund the $400,000.  There's a payment
13    plan.
14            MS. LONG:  There's a payment plan, yes.
15            THE COURT:  But it's expecting that some
16    money will go back to it because there will not be
17    100 percent of claims --
18            MS. LONG:  We don't imagine there will be
19    100 percent.
20            THE COURT:  Right.
21            MS. LONG:  But with that being said, my
22    clients are fully prepared to pay if there is.
23            THE COURT:  Right.
24            So everybody's anticipating that the
25    participation rate is not going to be 100 percent,

AMM TRANSCRIPTION SERVICE - 631.334.1445

1    and they're also anticipating that it could be

2    something like 60 percent, which would be pretty

3    good, I guess, in a class case.

4              MS. LONG:  Yes.

5              THE COURT:  Is that right?  Okay.

6              MR. KASKE:  Correct.

7              THE COURT:  So then, Mr. Kaske, why is it

8    that you or the plaintiffs' counsel is going to get

9    a third of the $400,000 no matter what?

10             MR. KASKE:  Your Honor, I think the

11   standard -- the majority of cases on this issue base

12   the fee on the pool created, not purely what is

13   claimed.  There are obviously some cases in which

14   key the attorneys' fees, especially when it's based

15   on a third of the fund going to the actual amount

16   claimed; however, the majority of cases key the

17   third to the total potential pool; in particular,

18   when defendant has agreed to, you know, fund the

19   full amount.

20             And there's not some, sort of, like,

21   backdoor relief valve or something like that.  You

22   know, some of these cases, you'll see, like, if over

23   X amount of dollars is claimed, the settlement is

24   null and void, and the parties will have to

25   renegotiate.  There's nothing like that here.  So

1  there is a, you know, potential for defendant to

2  come out of pocket for the full amount; therefore,

3  the third is keyed towards that full amount created.

4          And additionally, you know, we will --

5  fully willing to submit -- not fully willing.  We

6  will submit our lodestar and all of our hours in

7  detail, a final approval so the Court can do a

8  thorough crosscheck to make sure that we're not, you

9  know, taking an excessively large fee, you know, in

10  comparison to the work that we put in on the file.

11          THE COURT:  All right.  And based on your

12  estimate, what percentage of recovery will each

13  class member get relative to what they would get if

14  the case -- if they were successful at trial?

15          MR. KASKE:  Yeah.  Your Honor, we estimated

16  that it's about 6 percent of, like, the absolute

17  best-case scenario if we were to win at trial, which

18  would include -- you know, assuming that the class

19  members would be on about an hour of work a week

20  that they worked -- I mean, we did an analysis of

21  how often the spread of hours was happening, and it

22  appears to be -- when you look at a per-shift level

23  per week, you know, you're looking at -- it's a

24  0.046 rate per shift.  And plus, everybody would get

25  the full $10,000 in -- or up to $10,000 in the, you

1    know, $5,000 for the wage notice and the $5,000 for

2    wage statement claims.

3            THE COURT:  Right.  If you put those aside,

4    if you're only talking about the -- I think it's

5    overtime wages here, right?

6            MR. KASKE:  Yeah.

7            THE COURT:  Okay.  If we're talking about

8    the overtime wages alone, it's still only 6 percent?

9            MR. KASKE:  So no.  If you were to -- our

10   overtime and, like, off-the-clock payment is a bit

11   combined in that for purposes of discussions and

12   figuring out what the exposure would be.  I mean,

13   basically, we're looking at a combination of unpaid

14   work, right.  It could be either overtime -- whether

15   it's overtime or it's just a regular hour that was

16   not paid, like a lunch break sort of thing.  We did

17   conflate that bit, particularly because some of the

18   class members just didn't work overtime.

19            There's a good number of class members that

20   are part-timers.  You know, these are -- like,

21   particularly, a lot of the cashiers at the Popeye's

22   restaurants don't work full-time, so they're not

23   going to have any sort of overtime plan.  But, you

24   know, we believe that at trial, ultimately we could

25   prove that they did work hours that were not

1    recorded on their timesheets ultimately, and not

2    paid.

3         So the overtime and that regular back-wage

4    number are blended.  And if you would put those

5    together and throw in the spread of hours in there

6    as well, the total exposure is -- let me just do one

7    quick piece of math.

8         All right.  So that total number is 1.84

9    million in total exposure.  So that would be about

10   13 -- so the net fund that's being divvied up is

11   about 13 percent of what the total back-wage number

12   would be for the overtime unpaid, unpaid regular

13   time and the spread of hours combined.

14        THE COURT:  So the growth -- I'm sorry --

15   the net settlement amount, I have at about 214,000.

16        MR. KASKE:  Yes.

17        THE COURT:  And then you said the full

18   recovery would be 1.84 million?

19        MR. KASKE:  Yes.  Hold on a second.

20        Yeah.  Sorry.  It's 11.6.

21        THE COURT:  It's 11.6 percent.

22        MR. KASKE:  Yeah, 11.6 percent.

23        THE COURT:  All right.  And I appreciate

24   that that is, you know, what is often necessary for

25   purposes of settling a case.  People settle for less

AMM TRANSCRIPTION SERVICE - 631.334.1445

1    than their full recovery.  But I'm still struggling

2    with the fact that there's likely to be a somewhat

3    large amount of money that then goes back to the

4    defendants, and also that there's already taken off

5    the top regardless of how many claims are made,

6    money paid to the lawyers.

7         So, in other words, it feels like the

8    plaintiffs' lawyers are getting paid no matter what,

9    and then the defendants are expecting some chunk of

10   money back.  And the workers, even the ones who make

11   the valid claims, are only going to get less than 12

12   percent of what the plaintiffs' counsels have

13   alleged that they are owed.  And that seems like

14   numbers that are skewed.

15        MR. KASKE:  Yeah.  I mean, I definitely

16   understand that sentiment, Your Honor.  We think

17   that the -- you know, and particularly as we'll

18   demonstrate at final approval, that, you know, the

19   fee that we're receiving in the case, you know, is

20   justified not just in the precedent, but also just

21   in the amount of work that we'll have put in the

22   case through -- get through final approval.

23        You know, additionally, you know, in order

24   to maximize the potential recovery of this case, you

25   know, the structure that the parties ultimately

AMM TRANSCRIPTION SERVICE - 631.334.1445

1    agreed to -- even though we explored other

2    structures with the mediator and then, you know,

3    after mediation failed, throughout the process, you

4    know, we explored non-reversionary structures, and

5    just -- the parties couldn't make the math work, and

6    ultimately, you know, decided on this structure,

7    which, you know, is regularly approved in this

8    district as -- it's fair and reasonable.

9            We acknowledge that this is not as much

10   money as these workers deserve, from our

11   perspective.  Defendants, of course, would say this

12   is more money than any of these people deserve.  We

13   obviously totally disagree.  But we believe that

14   given the risks of continuing this case through

15   trial for all these workers on a class-wide basis

16   and proving all their claims, both on liability and

17   damages on a class-wide basis, as well as going

18   through the collective action process of notifying

19   them, getting folks to opt in, then doing an opt-in

20   discovery on those, that -- and dealing with folks

21   that ultimately disappear in the middle of the

22   opt-in discovery process, that this is a good result

23   for this group.

24           THE COURT:  All right.  So let me ask you a

25   couple more questions.

1          Can you tell me about this cy pres

2     organization.  I've never heard of it.

3          MR. KASKE:  Yeah.  So, Your Honor, they're

4     a small workers center out in Long Island City.

5     They've been around for over a decade.  They work

6     with workers particularly in the food production

7     industry, helping them organize and advocate for

8     better -- and giving workers the tools to advocate

9     for themselves to get better working conditions and

10    increase wages and such.

11         You know, their prior executive director

12    was an attorney, so he, you know, worked at the time

13    to bring some litigation early on for wage cases on

14    grab-food food workers.  You know, I've known them

15    personally for about a decade as well, and, you

16    know, I personally believe that they do good work.

17    And they are -- they don't really have the best

18    budget.  So, you know, any little bit would be nice

19    for them to, you know, keep operating and helping

20    workers in the New York City area, which -- where

21    our -- or where the defendants' locations are based.

22    So we think there's sufficient overlap here between

23    the claims, the ...

24         THE COURT:  Okay.  And then I wanted to

25    turn to the proposed notice that was updated with

1    information on the FLSA.  So this is Document 69-1.

2         I think there's still some language in

3    there that's not clear about what is being -- the

4    difference between the FLSA and the New York State

5    claim.  So on page 1, in the box where it says

6    "exclude yourself," it says, "If you submit a timely

7    exclusion statement, you will not be part of the

8    settlement of this case.  This is the only option

9    that allows you to retain your right to sue

10   defendants."  And that's not strictly true.

11        This is the only option that allows you to

12   retain your right to sue defendants under state law.

13        MR. KASKE:  Correct.

14        THE COURT:  And it should then say, you

15   know, you can still sue under federal law, or

16   something like that.

17        Similarly on page 4, it talks about

18   exclusion under Section 8.  And the question is, if

19   I don't exclude myself, can I sue defendants for the

20   same thing later?  And it starts by saying no.  And,

21   again, that's not true.  So it should say, if you do

22   not exclude yourself, then --

23        MR. KASKE:  Yeah.

24        THE COURT:  Oh, you could --

25        MR. KASKE:  It should --

AMM TRANSCRIPTION SERVICE - 631.334.1445

```
 1            THE COURT:  Yeah, then you can say you're
 2    giving up your rights to sue defendants for
 3    violations of New York Labor Law, Fair Workweek Law
 4    of New York City.  But I think that what you say in
 5    the second paragraph needs to be moved up there to
 6    say you'll retain your right to sue defendants for
 7    violations of the federal overtime law, FLSA only,
 8    right.
 9            So that should go up there, and then you
10    can have the next paragraph, if you have a pending
11    lawsuit, speak to your lawyer.  Okay.
12            MR. KASKE:  Yeah.
13            THE COURT:  So I think it just needs to be
14    clear each time you mention exclusion, that if you
15    don't exclude, it doesn't affect their federal
16    right.  And then -- so, in other words, just so the
17    drafting is clear, the answer to number 8 will say,
18    if you do not exclude yourself, you will give any
19    rights to sue defendants for violations of the New
20    York Labor Law and the New York City Law, but you
21    retain your right to sue defendants for violations
22    of the federal overtime law of the FLSA only.  If
23    you have a pending lawsuit, speak to your lawyer,
24    et cetera.  Okay.
25            And then that second sentence of the second
```

1    paragraph, you will not be able to sue, that's
2    redundant because you've already said that you give
3    up any rights to sue from the first paragraph.  So
4    you can't say no immediately because that's not
5    strictly true.
6                MR. KASKE:  Correct, Your Honor.
7                THE COURT:  So then on page 3, just on how
8    you can get your payment, I assume -- at the second
9    paragraph, it says, "if you submit a claim form, you
10   will be sent a settlement check."  But I assume it's
11   a valid claim form, right.  So it's not just if
12   anybody -- or timely, because earlier you also call
13   it timely.
14               So is there going to be some -- I guess
15   since the claim forms are all unique claim forms and
16   the calculations for the amount that each individual
17   receiving it will be paid, that the claims
18   administrator will be keeping track to make sure
19   that they are all valid and that it's not, you know,
20   a particular person sending in two copies of the
21   same notice, right, for two different -- for the
22   same person.
23               MR. KASKE:  Right.  Yes, Your Honor.
24               THE COURT:  So there will be some effort
25   made?  Yeah.

1          MR. KASKE:  Yes, Your Honor.  I can
2     speak -- this is Garrett Kaske again.
3          The claims administrator usually puts some
4     sort of, like, individual ID that they use on their
5     tracking purposes on all the forms.
6          THE COURT:  Okay.
7          MR. KASKE:  They don't just send out, like,
8     generic forms.  I mean, these notices all have, you
9     know, some sort of number on them.
10          THE COURT:  Right.
11          MR. KASKE:  They come in.  They process
12     them.  They're going to update the parties regularly
13     throughout the process to tell them how to make the
14     claims and make inquiries to make sure that all of
15     these claims forms are valid.  And they'll notify us
16     if there's any issues in terms of improperly
17     executed or duplicates.
18          THE COURT:  Right.
19          MR. KASKE:  And they'll -- because
20     sometimes what will happen is someone will seek a
21     claim form.  You know, it won't come to them.
22     They'll hear about the case.  They'll call us or
23     they'll call the claims administrator, and they'll
24     get a new claim form, and then the old one will
25     somehow appear at their house, you know, by way of

1    forwarding address or stuff like that.  No sending

2    two.

3          But because the claims administrator will

4    have the entire class list with all the Social

5    Security numbers, and will be using some sort of ID

6    system where they slap on a generated number that

7    links in their system the claim form, the notice,

8    and to the individuals on it.  If we get two of the

9    same, they'll note that that person's already

10    claimed and they're all set.

11          For improperly submitted forms, like if

12    someone will just not sign it and just, kind of, put

13    it in the envelope and send it back, they will

14    notify us, and as we'll make an effort to notify the

15    individual that they've not properly executed the

16    claim form.

17          THE COURT:  Right.  Okay.

18          MR. KASKE:  And if anything comes up,

19    Your Honor, with regards to issues that -- where

20    someone submits a late claim form that has good

21    cause, you know, the claims administrator can advise

22    the parties.  And we're also happy to bring all

23    those matter -- and so if there are, which we don't

24    expect any issues that the claims administrator and

25    the parties can't work out that process, we can

1    bring them to Your Honor for review and approval at

2    time of final approval to make sure that everyone's

3    treated fairly.

4             THE COURT:  Right.  Okay.

5             And so from a drafting perspective, the

6    notice should be more consistent about sometimes the

7    description of the claim form because sometimes it

8    says, if you return a timely claim form.  And then

9    sometimes it says, your claim form must be properly

10   submitted.  And then other times it simply says, if

11   you submit a claim form, you will get money.

12            And so I just need to make sure that you're

13   clear about that because you will get arguments,

14   perhaps, when people send a claim form and say, no

15   one said it had to be any particular way, but I

16   didn't get the money.  So it is more a drafting

17   concern that it be clearly stated what it means,

18   just because it says many different things in

19   different parts.  Okay.

20            MR. KASKE:  Yeah.  Understood.

21            THE COURT:  And the same thing here on the

22   claim form because the claim notice says, you will

23   receive.  And then on the claim form, which is

24   Document 69-2, it says, your estimated amount.  And

25   then it says, minus applicable taxes.  And so I just

1    wasn't -- I just want to be -- you know, you just

2    need to go through it again to be clear that you're

3    not promising that you're getting paid that exact

4    amount and now, here, you've set applicable taxes.

5    All right.

6              MR. KASKE:  Yeah.

7              THE COURT:  And then the last thing I had

8    questions about is with regard to the final

9    settlement approval hearing.

10             How many days does that -- how many days do

11   you need between the time of a preliminary approval

12   order and the hearing, just for scheduling purposes?

13             MR. KASKE:  All right.  Yes, Your Honor.

14   One second.

15             I apologize.  I'm just taking notes on the

16   last matter so I don't miss anything.

17             Yes, about 145 days.

18             THE COURT:  Okay.  And so that's

19   enough to -- that's enough time to get the list of

20   class members, mail the notices, get the notices

21   back, and then whatever other period is necessary?

22             MR. KASKE:  Yes.

23             THE COURT:  Okay.

24             MR. KASKE:  And get the notices back and

25   prepare the final approval papers indicating, you

1   know, the number of opt-in and -outs, provide the

2   Court with any objections, if any.

3            THE COURT:  Right.

4            MR. KASKE:  And if there are --

5            THE COURT:  Sure.  Okay.

6            And then you -- I wanted to know what the

7   method of holding that final approval hearing should

8   be.  Was there a discussion about whether it should

9   be in person or by phone?  How are the parties

10  proposing?

11           MR. KASKE:  It's up to Your Honor.

12  Whatever you would prefer, we're open to.

13           THE COURT:  Oh, okay.  I mean, since you

14  know your clients and the potential class members,

15  what is better for them?

16           MR. KASKE:  Either -- you know, I think --

17  Your Honor, obviously, I think a teleconference

18  would probably be the -- like this one would

19  probably be the easiest for purposes of -- if

20  individuals that are objecting, if there are any, or

21  others want to participate, this is probably the

22  least likely to be discouraging.  It's probably --

23  on the other hand, it's probably the most difficult

24  to manage.  A lot of voices, right?  So there

25  is that trade-off.

```
 1            THE COURT:  Right.  Which is why I'm asking
 2   you because -- because if you anticipate that there
 3   will be a lot of people showing up, then you are
 4   correct holding it, but it may be difficult to
 5   manage, and I might have to think about it.  If you
 6   don't think there will be a lot of people showing
 7   up, but you would like to make it easy for anyone
 8   who does want to show up, then you are correct, the
 9   phone is more convenient.
10            MR. KASKE:  Yes.
11            THE COURT:  I don't know the potential
12   class, and so I don't have a sense of how the
13   response -- how you anticipate the response to be,
14   so that's why I'm asking you the question.
15            MR. KASKE:  Yeah, Your Honor, I don't
16   expect anybody asking to show up at the hearing,
17   admittedly.  I think it's very -- we found it's very
18   rare.  And I think that folks will -- you know, at
19   most, like, you know, one or two -- the most I would
20   anticipate would be one or two people might ask to
21   speak at the hearing, but I highly doubt that anyone
22   will ask to speak at the hearing, knowing that it's
23   only 470 individuals in the case.
24            So if Your Honor wants to do this by -- the
25   final approval hearing by telephone again, just like
```

AMM TRANSCRIPTION SERVICE - 631.334.1445

1    this one, I think that would be -- would work just

2    fine.  I'm curious if the defendants have any

3    thoughts on their end.

4              THE COURT:  Ms. Long?

5              MS. LONG:  You know, whatever Garrett says,

6    that sounds fine with me, Your Honor.

7              THE COURT:  Okay.  Great.

8              And I actually do have one more question.

9    It's about the dates for funding the growth

10   settlement fund.

11             The installment plan had a first funding

12   date of April 1st, and then the second one of

13   June 1st.  Those have already passed.  So my

14   question is, do those dates need to be changed?

15             MS. LONG:  Updated.

16             THE COURT:  Yes.

17             MS. LONG:  Yes, Your Honor, they do.

18             MR. KASKE:  Yes.

19             THE COURT:  Okay.  So what do you

20   anticipate for those dates?

21             MS. LONG:  If we could push them out, I

22   guess, if Mr. Kaske's fine with it, to do the first

23   payment July 30th, and then have the same payment

24   schedule as prior -- you know, the same amount of

25   time in between.

1          THE COURT:  That's two months, two months,
2     and two months.
3          MS. LONG:  Yes.
4          THE COURT:  So then you're not going to be
5     fully funded by the time we have our final hearing.
6          MS. LONG:  Your Honor, if you would allow
7     me a 24-hour turnaround, I can contact my client and
8     see if he could start it June 30th.  And if he can,
9     that may push -- that would be able to push us up.
10         THE COURT:  Okay.
11         MS. LONG:  Theoretically, he's got -- you
12    know, he has been waiting on this to get approved,
13    so theoretically it shouldn't be an issue, but --
14         THE COURT:  Right.
15         MS. LONG:  -- it is about the fluid -- you
16    know, whatever cash they have available.
17         THE COURT:  Right.
18         MS. LONG:  Again, as I said, they are
19    paying out of pocket.  But if you can push it up to
20    June 30th, I can let the Court know within the next
21    24 hours.
22         THE COURT:  Okay.  So then what I would
23    just want to make sure that we're -- because this is
24    eight months, so let me just see.
25              Well, actually, from June 30th, then it

1   would be August -- well, it would take us to the end

2   of December, I think, at that rate.

3          All right.  Let me -- so is it that your

4   client needs to have two-month intervals?

5          MS. LONG:  Yes, Your Honor.

6          THE COURT:  Okay.

7          MS. LONG:  They don't have that kind of

8   liquid cash.

9          THE COURT:  Sure.  And the money that was

10  supposed to be put in April 1st was not set aside.

11         MS. LONG:  It may have been.  I did ask

12  them to do so, Your Honor.

13         THE COURT:  Okay.  You don't know.  Okay.

14  No.  That's fine.  Okay.  So what I'll do is then,

15  I'll just leave that, sort of, open ended for now

16  so -- and then you can fill that in.

17         What I'm going to do is I will give some

18  thought to the things that we talked about today.  I

19  will issue my written order with regard to your

20  motion.  It will either approve what has been

21  submitted, approve with changes.  I mean, we've

22  already talked about some of the changes that should

23  be made to the notice form and the claim form.

24         I may ask you to submit that first, the

25  revised version of those things, including a revised

1    version of the settlement that includes the amended

2    Section 8, and then these updated dates under

3    Section 4.1.  I think that actually makes the most

4    sense.  So I'm thinking out loud, so I apologize.

5            So what I'll do is, if I have any further

6    thoughts on things that need to be changed, I will

7    ask -- I'll put that in an order in the next day or

8    so.  And then once I do that, I will also direct the

9    parties to refile a complete and updated settlement

10   agreement that has the new Section 8 that was added

11   with the FLSA information, and then some of the

12   things we talked about, including the updated dates

13   for funding, and the updated notice and claim forms.

14   And then, at that point, I'll review it and issue my

15   preliminary approval order.

16           If you've done all the things That I talked

17   about, then that should be fairly straightforward.

18   If I still have issues, I will raise them with the

19   parties.  But I think that makes more sense because

20   right now there are documents that are a little bit

21   out of date, and so I'd like to have those before I

22   issue my preliminary approval order.  But I will

23   just give myself a day or two to think through

24   whether there are any additional things in addition

25   to what we talked about this morning that I would

AMM TRANSCRIPTION SERVICE - 631.334.1445

1    like the parties to address.

2         Okay.  So look for my order.  That will

3    give you some direction as to whether there are any

4    additional issues.  If not, I will enter an order

5    that asks you to file the updated settlement

6    approval and claim and notice forms, and then I will

7    review those in issuing my preliminary approval

8    order.

9         All right.  So is that clear for the

10   plaintiffs?  Do you have any other things you want

11   to raise?

12        MR. KASKE:  Your Honor, that is perfectly

13   clear, and we appreciate your time.  I do want to

14   just mention one thing in plaintiffs' brief that was

15   a misstatement that I would feel bad if we ended

16   this call and I did not point out to Your Honor.

17        We cited an out-of-date proposition that

18   settlements reached by experienced counsel after

19   arm's-length negotiations are presumed to be fair.

20   In 2023, in the *Moses* case, the Second Circuit

21   clarified that because of the amendments to Rule 23,

22   that presumption -- arm's-length negotiations no

23   longer presume fairness of a class-action

24   settlement.  It's just one of the factors in the

25   analysis.

AMM TRANSCRIPTION SERVICE - 631.334.1445

1          But I do just want to point out, while Your

2     Honor is looking back over everything, is that even

3     if there's no presumption of fairness by ways of

4     arms'-length negotiations, you know, there were

5     arms'-length negotiations which suggest that it's

6     fair.  And the plaintiffs, in our brief, laid out

7     all the other factors in terms of why there's no

8     conflicts of interest between the parties, why the

9     individual class members and plaintiffs that are

10    prosecuting this matter, their interests are in line

11    with those of the class and, you know, putative

12    class counsel's qualifications in terms of being

13    able to represent the class.

14          THE COURT:  Okay.

15          MR. KASKE:  So all of those were researched

16    in full.  We didn't just rely on this slightly

17    outdated authority.  So I just want to be clear with

18    Your Honor on that.

19          THE COURT:  Okay.  I appreciate that.

20    Thank you for pointing that out.

21          Ms. Long, anything else from the

22    defendants?

23          MS. LONG:  No, Your Honor.

24          THE COURT:  All right.  Thank you,

25    everybody, for your time this morning.  And I will

1    issue an order that gives you a little more

2    direction as to whether what we discussed today

3    would be sufficient for the updated filings or

4    whether I'll require more.

5            All right.  Thank you.

6            MR. KASKE:  Thank you.

7            MS. LONG:  Thank you.

8

9                        0o0

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1
2                        C E R T I F I C A T E
3
4        I, Adrienne M. Mignano, certify that the
5    foregoing transcript of proceedings in the case of
6    Campbell, et al v. Bukhari Group LLC;
7    Docket #22CV2813 was prepared using digital
8    transcription software and is a true and accurate
9    record of the proceedings.
10
11
12   Signature  _Adrienne M. Mignano_____
13              ADRIENNE M. MIGNANO, RPR
14
15   Date:      August 7, 2024
16
17
18
19
20
21
22
23
24
25
```